FILED

2014 May-06  PM 02:36
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION

| | | |
|---|---|---|
| CONSTANCE WELLS, | ) | |
| | ) | |
| Plaintiff; | ) | |
| | ) | |
| vs. | ) | 7:12-cv-03603-LSC |
| | ) | |
| NICK OLSON, et al., | ) | |
| | ) | |
| Defendants. | ) | |

MEMORANDUM OF OPINION

Constance Wells ("Wells") brought this action seeking damages based on various Alabama state law tort theories for alleged sexual harassment that occurred while she was employed at Defendant America's Car Mart Inc. ("Car Mart"). Before the Court is Car Mart's motion for summary judgment on all claims against it. (Doc. 19.) For the reasons stated below, the motion is due to be granted in part and denied in part.

## I.    BACKGROUND

Car Mart hired Wells to serve as an on-call driver in September 2007. When she was hired, Car Mart provided her with an Associate Manual that contained provisions prohibiting sexual harassment and identifying her options to report sexual harassment

and other misconduct. After two months on the job, Car Mart promoted Wells to an office manager position. Wells worked as the office manager in the Tuscaloosa Car Mart store in February 2011, when the alleged misconduct occurred.

Defendant Nick Olson ("Olson") was hired as a Car Mart manager-in-training in 2010. His job required him to travel to a number of different stores, including the store in Tuscaloosa, Alabama, where Wells worked. Although the parties dispute the amount of time that Olson spent at the Tuscaloosa store, both parties admit that he split his time between the Tuscaloosa store and other locations.

Wells contends that Olson began sexually harassing her approximately three days after he began working around her. Specifically, Olson allegedly made inappropriate comments about Wells's body and clothing, sent her text messages inviting her to his hotel room, positioned himself behind Wells at the office so as to "brush" against her, and called her repeatedly to discuss his relationship with his wife. Two Car Mart employees, Willie Williams ("Williams") and Cornelius Fowler ("Fowler"), mentioned at least some of this conduct to George Wilder ("Wilder"), the general manager of the Tuscaloosa store.

Wells told Wilder about some of her issues with Olson after Olson placed a "tulip" made from paper clips on Wells's desk while she was at lunch. She showed

the "tulip" to Wilder, told him that Olson had placed it there, and informed him that Olson regularly made similar types of advances. Wells asserts that Wilder asked, "[R]eally?" to which she replied, "[Y]es, really," and Wilder "kind of smirked, and then he sat down at his desk." (Doc. 21-1 at 38.) According to Wells, Olson came into her office and threatened her not long after she spoke with Wilder. Olson allegedly implied that he would kill anyone who caused him to lose his job and made additional threats against her life. After this, Wells refrained from making any further complaints against Olson.

Apparently, Wells ended her employment at Car Mart in late February 2011. She testified that Olson made two or three additional attempts to contact her after she left Car Mart by having Williams call her. Olson would then get on Williams's phone and attempt to talk to Wells.

Car Mart asserts that it first learned of these events when Barbara Brown ("Brown"), Car Mart's Human Resources Manager, discovered it while investigating a separate sexual harassment complaint. Brown launched an investigation into Wells's allegations during which she spoke with Wells and many of her co-workers. Car Mart ultimately issued Olson an "Associate Correction Form," provided him with counseling, and bypassed him for a promotion. Regardless, Wells contends that Olson

was ultimately promoted to a general manager position.

Wells filed suit in state court in Tuscaloosa County, Alabama, on June 1, 2012, claiming that Olson's conduct amounted to assault and battery, invasion of privacy, and outrage. She also sought to hold Car Mart both directly and vicariously liable for Olson's actions. Wells premised her theories of direct liability on negligent and wanton hiring, training, supervision, and retention of Olson. The Defendants removed the action to this Court on October 15, 2012, invoking the Court's diversity jurisdiction.

## II.    STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986); *see also Avenue CLO Fund, Ltd. v. Bank of Am., NA*, 723 F.3d 1287, 1294 (11th Cir. 2013). There is a "genuine dispute" as to a material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248, 106 S. Ct. at 2510. The trial judge should not weigh the evidence but must simply determine whether there are any

genuine issues that should be resolved at trial.  *Id.* at 249, 106 S. Ct. at 2511.

In considering a motion for summary judgment, trial courts must give deference to the non-moving party by "considering all of the evidence and the inferences it may yield in the light most favorable to the nonmoving party." *McGee v. Sentinel Offender Servs., LLC*, 719 F.3d 1236, 1242 (11th Cir. 2013) (citing *Ellis v. England*, 432 F.3d 1321, 1325 (11th Cir. 2005)). In making a motion for summary judgment, "the moving party has the burden of either negating an essential element of the nonmoving party's case or showing that there is no evidence to prove a fact necessary to the nonmoving party's case." *Id.* Although the trial courts must use caution when granting motions for summary judgment, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S. Ct. 2548, 2555 (1986).

## III.   DISCUSSION

### A.   Respondeat Superior

An employer is vicariously liable for the intentional torts of its employees if the employee can offer sufficient evidence: "(1) that the agent's wrongful acts were committed in the line and scope of the agent's employment; or (2) that the acts were committed in furtherance of the business of the employer; or (3) that the employer

participated in, authorized, or ratified the wrongful acts." *Machen v. Childersburg Bancorporation, Inc.*, 761 So. 2d 981, 984 (Ala. 1999) (internal quotation marks omitted). Wells concedes that the first two bases for vicarious liability do not apply, and the only issue is whether Car Mart ratified Olson's allegedly tortious conduct.

An employer ratifies an employee's tortious conduct if the plaintiff can demonstrate that the employer:

> (1) had actual knowledge of the tortious conduct of the offending employee and that the tortious conduct was directed at and visited upon the complaining employee; (2) that based upon this knowledge, the employer knew, or should have known, that such conduct constituted sexual harassment and/or a continuing tort; and (3) that the employer failed to take 'adequate' steps to remedy the situation.

*Potts v. BE&K Constr. Co.*, 604 So. 2d 398, 400 (Ala. 1992). The Court concludes that a factual dispute exists as to each of the three elements of ratification.

First, Car Mart contends that it lacked knowledge of Olson's conduct because Wells never complained to "higher management" in its corporate office. In Title VII cases, a plaintiff must generally prove an employer's knowledge by showing that she reported her complaints to "higher management." *See, e.g.*, *Kilgore v. Thompson & Brock Mgmt., Inc.*, 93 F.3d 752, 753–754 (11th Cir. 1996). However, Alabama has not applied the "higher management" standard used in Title VII cases to state law

*respondeat superior* claims. Instead, Alabama typically looks to whether the plaintiff informed a supervisor of the misconduct. *See Henry v. Ga.-Pac. Corp.*, 730 So. 2d 119 (Ala. 1998) (finding that the plaintiff complained to a supervisor about sexual harassment from a physician hired to provide counseling services to employees); *Mardis v. Robbins Tire & Rubber Co.*, 669 So. 2d 885 (Ala. 1995) (concluding that a jury could find that the defendant employer knew of alleged sexual harassment when the plaintiff discussed it with a plant personnel manager).

Although Wells did not have to tell a corporate-level manager about the harassment, she did need to inform someone who could actually address the problem. *See Moman v. Gregorson's Foods, Inc.*, 570 So. 2d 1215, 1216–1217 (Ala. 1990) (noting that "management" at the defendant employer lacked knowledge of the misconduct because the plaintiff had only complained to the employee who was sexually harassing her). Here, Wells has produced evidence to suggest that she complied with Car Mart's policies for reporting sexual misconduct. Car Mart's associate manual indicates that "[t]here are several effective avenues available" for associates to report complaints or concerns in the workplace. (Doc. 19-10 at 13.) The manual touts that Car Mart has an "Open Door Policy" and tells employees that "[o]ften the most effective and timely approach to resolving your complaint is by discussing it with your

manager." (*Id.*) Associates were also told that they "can go directly to a member of the Company's corporate management" or may call a "hot line" if they "do not want to discuss [the complaint] face-to-face with management." (*Id.*) Wells testified that she discussed Olson's conduct with Wilder, and therefore a jury could conclude that notice to Wilder was notice to Car Mart.

However, Car Mart argues that Wells's complaints were too vague to notify it of the extent of Olson's tortious conduct. Wells testified that she personally complained to Wilder about the paper clip "tulip" on her desk. She also told Wilder that Olson "does stuff like this all of the time." (Doc. 21-1 at 38.) Wilder then asked, "[R]eally?" to which she responded, "[Y]es, really," and Wilder "kind of smirked, and then he sat down at his desk." (*Id.*) Although she did not recount other instances of misconduct, her testimony alone would alert Wilder to a possible invasion of her privacy. *See Busby v. Truswal Sys. Corp.*, 551 So. 2d 322, 327 (Ala. 1989) (determining that even "generalized complaints" could allow the jury to find that an employer ratified an invasion of privacy).

Two of Wells's co-workers also testified that they mentioned Olson's behavior to Wilder. Williams testified that he received an explicit message from Olson by mistake and that the message was intended for Wells. (Doc. 21-5 at 18–19.) He also

testified that he observed Olson "smack[] [Wells] on the butt." (*Id.* at 22.) Williams observed other instances where Olson directed sexually explicit comments or invitations to Wells, and he swore in an affidavit that he told Wilder both about Olson's inappropriate comments *and* behavior before Wells left Car Mart. (Doc. 21-7 at 1.) Moreover, Fowler testified that he observed Olson position himself behind Wells in such positions that he would "brush" against her when she was walking. (Doc. 21-6 at 20.) Fowler also discussed Olson's conduct with Wilder several times.[1]

Williams's and Fowler's complaints indicate that Wilder could have known that Wells was the victim of a battery. *See Ex parte Atmore Cmty. Hosp.*, 719 So. 2d 1190, 1193 (Ala. 1998) (noting that a battery is an intentional touching of the plaintiff in a harmful or offensive manner). All of these complaints, taken together, also suggest that a jury could find that Wilder's knowledge of Olson's pervasive misconduct might constitute ratification of the tort of outrage. *See Mardis*, 669 So. 2d at 889 (finding that ratification was a jury question when individual tort claims of assault and battery,

---

[1] It is unclear from the record exactly when Fowler's complaints occurred. Although Fowler testified at his deposition that he told Wilder that Olson's conduct might lead to a "sexual harassment case," it appears that he only made these comments after Wells left. Fowler testified that Wells left Car Mart before he did, and he testified that this conversation with Wilder occurred after he had left Car Mart. However, Fowler also testified that he spoke to Wilder about Olson's conduct before he left, and the Court assumes in Wells's favor that this comment was made before Wells left. *See Dawkins v. Fulton Cnty. Gov't.*, 733 F.3d 1084, 1092 (11th Cir. 2013) ("[A]ny reasonable doubts about the facts at the summary judgment stage should be resolved in favor of . . . the non-movant.").

invasion of privacy, and outrage, were pending in the trial court and the individual presented evidence that she told a supervisor about the misconduct); *Kurtts v. Chiropractic Strategies Grp., Inc.*, 481 F. App'x 462, 468 (11th Cir. 2012) (determining that the plaintiff's complaints were sufficient to put an employer on notice of sexual harassment such that it had ratified a claim of outrage).

Finally, there is a factual dispute as to whether Car Mart adequately remedied the situation. Although Car Mart argues that its corporate office made a thorough investigation into the allegations, the Court has already determined that a jury could conclude that the complaints to Wilder placed Cart Mart on notice of the misconduct. Wells's facts suggest that Wilder immediately told Olson after Wells complained, and Olson responded by making threats to Wells. A jury could conclude that Wilder failed to adequately respond to the situation. *Cf. Joyner v. AAA Cooper Transp.*, 477 So. 2d 364, 365 (Ala. 1985) (determining that an employer did not ratify an employee's misconduct when the employer launched an immediate investigation, assured the wronged employee that no further incidents would occur, and, in fact, no additional incidents occurred).

In sum, Wells has created a factual dispute as to each of the three elements of ratification. A jury could conclude that Car Mart ratified Olson's conduct toward

Wells and therefore hold it vicariously liable for Olson's torts. Summary judgment is due to be denied as to the *respondeat superior* claim.

### B.     Negligence and Wantonness

Wells seeks to hold Car Mart directly liable based on various theories of both negligence and wantonness. Specifically, she contends that Car Mart negligently or wantonly hired, trained, supervised, and retained Olson. Car Mart has moved for summary judgment on each of these claims.  In her brief Wells stated that she "is electing to not continue pursuing her claims for negligent and/or wanton hiring or training." (Doc. 21 at 14 n.2.) Thus, summary judgment is due to be granted on those claims. However, the Court must determine whether Wells has survived summary judgment on her supervision and retention claims.

"In the master and servant relationship, the master is held responsible for his servant's incompetency when notice or knowledge, either actual or presumed, of such unfitness has been brought to him." *Thompson v. Havard*, 235 So. 2d 853, 858 (Ala. 1970). To survive summary judgment on a negligent supervision claim, the plaintiff must produce "affirmative proof that such incompetency was actually known by the master or that, had he exercised due care and proper diligence, he would have learned that which would charge him in the law with such knowledge." *Id*. To demonstrate

wanton supervision the plaintiff must show that the employer recklessly or consciously disregarded the safety of others. *See Big B, Inc. v. Cottingham*, 634 So. 2d 999, 1004 (Ala. 1993) (abrogated on other grounds as recognized in *Horton Homes, Inc. v. Brooks*, 832 So. 2d 44 (Ala. 2001)).

Car Mart argues that it is entitled to summary judgement because unlike in *Big B*, where the Alabama Supreme Court found a fact question as to wantonness, there were no previous sexual harassment complaints against Olson from people other than Wells. However, these facts actually present a stronger case than in *Big B*. In *Big B* a store security guard sexually assaulted a customer. Before the assault, a part-time employee's mother complained that the security guard had made an unwanted sexual advance toward her daughter. 634 So. 2d at 1003. The employee received a warning after the incident, but the employer took no further action. The *Big B* Court concluded that the jury could find negligent or wanton supervision in the subsequent assault of the customer. 634 So. 2d at 1003–1004.

Here, Wilder received *multiple* complaints concerning Olson's conduct toward Wells. The strength of this connection makes it more likely, not less likely, that a jury could conclude that Wilder should have taken additional action against Olson in order to protect Wells from any further abuse. Unlike in *Big B*, the jury could also conclude

that Wilder never issued *any* type of warning to Olson after Wells and her co-workers complained about him.

A jury could determine that in telling Olson immediately about the complaint Wilder negligently created a situation where Wells would likely face threats of retaliation. *See Machen*, 761 So. 2d at 986–987. On the issue of wantonness, the jury could conclude that Wilder, and so Car Mart, "consciously chose to downplay the incident in order to retain [Olson], knowing that to do so would likely give [Olson] another opportunity to demean or otherwise mistreat a female . . . employee." *Big B, Inc.*, 634 So. 2d at 1004. Wells's wanton supervision claim also survives summary judgment. *Id.*

Similarly, these facts would preclude summary judgment on Wells's negligent or wanton retention claims. The tort of negligent or wanton retention is related to the doctrine of negligent or wanton supervision in that both torts are premised on an employee's acts of incompetence that caused the plaintiff injury. *See Jones Express, Inc. v. Jackson*, 86 So. 3d 298, 305 (Ala. 2010) (noting that the torts of negligent hiring, retention, training, and supervision are related). "[A]n employer has a duty to exercise reasonable care for the safety of his customers, patrons, or other invitees, and in fulfilling this duty he must use due care to avoid the selection or retention of any

employee whom he knows or should know is a person unworthy, by habits, temperament, or nature, to deal with the persons invited to the premises by the employer." *Brown v. Vanity Fair Mills, Inc.*, 277 So. 2d 893, 895 (Ala. 1973). An employee is an invitee on the premises of his or her employer. *Mills v. Wex-Tex Indus., Inc.*, 991 F. Supp. 1370, 1390 (M.D. Ala. 1997) (citing *Lawson v. Williams*, 514 So. 2d 882, 883 (Ala. 1987)). As with wanton supervision, a claim for wanton retention would exist if the conduct "is carried on with a reckless or conscious disregard of the rights or safety of others." *See* Ala. Code § 6-11-20(b)(3).

Car Mart contends that summary judgment should be granted on this claim because Car Mart decided to discipline and retain Olson after Wells already left Car Mart. Wells can argue to the jury that Olson should have been immediately investigated and disciplined more substantially after she and her co-workers reported Olson's conduct to Wilder. *See Machen*, 761 So. 2d at 987 (finding that a jury could conclude that the employer negligently or wantonly failed to take appropriate disciplinary measures after an employee reported sexual harassment).

In sum, summary judgment is due to be denied on Wells's claims of negligent or wanton supervision and negligent or wanton retention.

## IV.   CONCLUSION

For the reasons discussed above, Car Mart's motion for summary judgment (Doc. 19) is due to be granted in part and denied in part. Summary judgment is due to be granted as to the negligent or wanton hiring and training claims. However, summary judgment is due to be denied as to all other claims against Car Mart.

A separate order will be entered.

Done this 6th day of May 2014.

_____
L. SCOTT COOGLER
UNITED STATES DISTRICT JUDGE
174256